The District Court erred in this case by both ignoring critical evidence of discriminatory animus, retaliatory animus, and links between that animus and the actions that happened, and also by weighing the evidence improperly in violation of the summary judgment procedure under Rule 56. To begin with, it's very important to note that there's substantial speech here that indicates clearly the intent to discriminate against employees with African background. The appellant, Ms. Eze in particular, was told that Ms. Zimmerman, her supervisor, believed that the Africans in the facility were there to kill her and to do this somehow through their supposed voodoo. The evening manager was one. That was as one nurse, right? I'm sorry. That was as one nurse, is that right? Yes, that well, no, actually, there were two. One of the three plaintiff appellants. I'm thinking of the allegations made. Only one nurse made that allegation, is that right? In this case, one of the plaintiff appellants, Ms. Eze, makes that allegation, and so does Ms. Ross, who's not a party in the case, but is another witness. Well, that doesn't count. I'm only talking about who's in the case, the three nurses in the case. Yes. Only one nurse made that allegation. That's correct. The other's allegation dealt with national origin. No, I don't agree with that, Your Honor. What were their allegations that would make you say that it fits under Section 1981, which requires an allegation of race? First of all, let me just point out, Your Honor, that St. Francis speaks to the so does this court's decision two years ago and guesses as far as how to define race under 1981. Sure does. It deals with the broadness of it, but it doesn't use the word, but national origin clearly is not it. It talks about how close those things are, but if it's just national origin, it's not going to work. Judge Winn, there has never been a statement by the plaintiffs that, or plaintiff appellants, that this is just national origin. What are the statements by, leave that one out about the hostel right now, about the information you just mentioned. What are the other allegations made by the two there that you allege sufficient to make a claim under 1981 on the basis of race? Yes, so Ms. Ezev was told many times, I'm sorry, Ms. Ezev was told that... No, no, no, we need to go to the complaint, and we need to look at the complaint and determine what allegations were made by those two nurses that would be sufficient to allege a race discrimination under Section 1981. Not what she was told, not evidence, just what's in the complaint. Right. So, Ms. Ezev was told, okay, so... So pick up the complaint and tell me which allegation says something other than national origin regarding those other two. All of the comments, the entire context of all the comments that are made... That's a statement. Look at the complaint. You got the complaint? Yes, you're referring to the court complaint? The complaint that was filed on behalf of the two other nurses. Ms. Dozie and Mr. Aina. In that complaint, where does it state something other than national origin? I believe that it says that these are race discrimination violations under Section 1981. I got your belief, but I want to know where it is. The belief is good. When you come back on rebuttal, we'll just point it out to me then. Are you relying on the reference to them being black Africans? Is that what you're relying on? I believe the context of Judge Keenan is highly relevant here. No, I'm just talking about the language of your complaint. Isn't there a reference to black Africans? I believe there is in the complaint, but I would have to check that to be certain. Is that what you're relying on? I'm just trying to see if that, you know... Yes, because anything that's in the complaint that goes to African, we believe that under Section 1981... Sure it does, but make sure you're talking about the specific two that I talked about. You've got one that talks about African, and one that talks about voodoo, and probably, maybe, St. Francis helps you on that one. But I don't know what helps you on the other two. I believe St. Francis applies to the other two as well. I've got this. When you come back to rebuttal, show it to me. Will do, Your Honor. Can you tell me why it matters, what the difference is, whether these plaintiffs can sue under 1981 as well as under Title VII in this case? Well, in the case of Mr. Aina, he only alleges 1981 at this point, so it's important for that reason. In the case of the other two, the damages would be different, and also because of the language about national origin, as Judge Winn is pointing to, being there, it's important to note that Section 1981 does not cover national origin, which I suspect is part of what Judge Winn is referring to. No, that seems to be the law. It's not just me referring to it. Isn't that the law? Correct. Okay. Correct. But the national origin characterization, the characterization of everything as being only national origin is not consistent with the record or with the history here, because the general context is that the statements that are being made are being made against Africans. So we have a question of what is that national origin? Is that race? Is that both? We believe it's both. St. Francis goes there. Guesses basically goes there from a few years ago. But don't mix it up. There's one that says that. I just want to be clear. I don't think the other two say that. I don't think Africans are used in the other two. I will check that and discuss that with Your Honor on rebuttal. And you're not appealing any of the District Court's exhaustion findings, is that right? The District Court, I believe, found that the exhaustion was sufficient. Well, not for all of the claims. To the extent the District Court said there was exhaustion, you're not appealing. No. Okay. No, that's not an issue. The context here is that the hospital work environment involves many, many statements indicating the animus against Africans in the workplace. The evening manager, Ross, who was supervising, was told many times that getting rid of the Africans was the first order of business for her. She was also told that they wanted the Africans all out of the building, that the Africans are lazy. She was told almost daily in meetings that the effort was to get rid of the Africans and the word Africans would specifically be used. Ms. Hockradle told Mr. Aina in June of 2011 that they were trying to fire him for a long time because he was one of the Africans. Now, much of this evidence is undisputed. But as noted, the District Court did not address most of it. Now, with regard to the list of Africans, which was dictated to Ms. Ndozi, and then a similar thing was repeated with Supervisor Ross a few months later, that, again, that's something that the District Court did address, but basically made an improper credibility determination by saying that Ms. Ndozi's affidavit explaining it is not objective evidence, is the term that was used. In fact, statements that were made to Ms. Ndozi are admissions under the evidentiary rules and clearly are admissible at trial. The hospital work environment and constructive discharge issues, based on the statements, again, in Ms. Ndozi's situation, she's being required to go and discipline African employees. She's African herself. I don't think we can overstate how offensive that is at the point that Ms. Ndozi believes and is told that the discipline is regardless of the performance of the employees, that Ms. Zimmerman just wants them out. Zimmerman even said the first time that she was told that she didn't know them and she wanted them out. So all of Ms. Ndozi's subsequent employment experience at Randallstown is subject to that, is colored by what she was told at first and then the ongoing behavior that goes on after that. Are you proceeding under a McDonnell-Douglas burden-shifting theory or a direct evidence theory? I believe that, based on Foster and other cases, that what's really before the court is the summary judgment standard. I don't believe that an election has to be made at this point. I'm not saying, I'm just asking. I think that both could apply because there are statements here that could be burden-shifting statements, but even if there aren't, under the pretext standard, I think there's easily sufficient evidence to show that the intent to exclude the employees from the workplace was clear. And so in Ms. Eze's case in particular, the claim of the defense has been raised that she resigned. The evidence does not show that she resigned. The letters that were sent and the conversations that were held made it clear that she could return if she couldn't get work at Genesis Staffing, but when she responded within the timeframe that had been envisioned, they just wouldn't let her back and the emails show that that was by design. They didn't communicate with her, they didn't tell her anything. So that, I believe, could be a McDonnell-Douglas termination situation. Also, because of the statements that were made, it could be a burden-shifting situation. In the case of Ms. Ndozi, we are alleging a constructive discharge there because she did resign. The context has just been discussed and is discussed extensively in the briefs. I'd like to point out that part of the hostile work environment leading to the constructive discharge is the final written warning that was given to her. Many of the contentions that we made in... I don't mean to interrupt you there, Ms. Goldsmith, but it seems to me that your cases, your accounts other than the hostile work environment become very weak because of the disciplinary actions taken against these employees, particularly the fact that two of the nurses admitted they don't want to come to work at 7 a.m. for the shift turnover. And we're trying to get some sort of concession on that. And there certainly was evidence how important this is in terms of patient care, to have one shift communicate to another shift. So, isn't there a big difference in the weight of the evidence that you've shown with regard to... What is your evidence that overcomes these disciplinary records of all three of these people with regard to their termination and retaliatory hostile work environment claims? Number one, Judge Keenan, with regard to Ms. Ezeh, there's no disciplinary record against Ms. Ezeh until the final document, which is a performance improvement plan, not a disciplinary record. She doesn't want to come to work at 7 a.m., isn't that correct? And once the shift starts... She's very clear, and the record is clear, that she's upset that her peer, Ms. Thompson, who is not African, is not required to come at 7 a.m., but then Ms. Ezeh testifies that she would have come at 7 a.m. had that been the thing. It's very important to note that that 7 a.m. issue is... There is a note in the performance improvement plan document that says that the standard is that she needs to come at 7 a.m. There's no indication in there that she's being admonished or disciplined for not coming at 7 a.m. or that her performance is poor because she's talking about not coming at 7 a.m. Clearly, she's doing what she's supposed to do, but she expresses her dissatisfaction with the disparate treatment. All of this is happening in the context, both with Ndozi and with Ezeh, that's retaliatory. Okay, now Anna had a lot of issues, correct? Pardon? I'm sorry. Mr. Aina was told, and I know my time's expired. Yeah, but he has a lot of disciplinary actions, right? I don't believe he has a lot of disciplinary actions, and what we know is that the June action... The weight down on the patients, I remember distinctly, and there was an issue of dumping urine in the sink, wasn't there? No, that wasn't Mr. Aina. That's where they're claiming that Ms. Ndozi allowed that, but all of this, I'll leave this. I know my time's expired. All of this happens in the context where, A, the anti-African statements have been made, and B, Ndozi and Ezeh have protested these as discriminatory before these actions ever occurred. They're retaliatory in addition to being discriminatory. I apologize. Oh, no, that's okay. Thank you. Mr. McClellan? Thank you. May it please the Court, Daryl McClellan. I have the pleasure of representing the defendants or appellees in this action, 9109 Liberty Road and Genesis Eldercare Network Services, Inc. Your Honor, these cases involve three separate plaintiffs who, as Your Honors have pointed out, all need to show on their own the evidence to establish their claims of race or national origin discrimination. I'd like to point out, just to put everything in context here, there are three important dates that I think that the events of this case, that put the events of this case in perspective. One was August 9th of 2010 in the record of Joint Appendix 146. That was an email from Ruth Berenbach, who's the medical compliance officer at the center entitled Ramblestown Issues, which talks about the problems at the center in terms of the lack of disciplinary actions and the failure to hold nurses accountable. Two weeks later, August 25th of 2010, the center received from the Maryland Department of Health and Mental Hygiene a civil penalty of $5,000 for its deficient nursing practices. Ms. Berenbach's concerns were realized in that particular document. Ultimately, that's what led to the change in leadership at the facility. It just so happened that the leadership at the facility at the time consisted of two African, the African Director of Nursing and the African Administrator, and all of the Assistant Directors of Nursing were African. Did the nurses sufficiently allege in their complaint race as a basis for discrimination under Section 1981? I don't believe so, Your Honor. I think the reason is that the complaint is devoid of allegations that relate to specific ethnic characteristics for which they feel that they were discriminated against. The statement of black Africans in and of itself doesn't cut it here because in the context of what they're alleging, they're alleging that black Americans, people with the same ethnicity, were treated better. It's not based on race. It's solely based on the country of origin. In this context, Ms. Zimmerman, who becomes the Director of Nursing at the end of November, makes it very clear the requirements, as Your Honors have pointed out. One of the requirements for the Assistant Director of Nursing being that you come at 7 a.m. This was in a memo that she sent out on January 10, 2011 to all of the Assistant Directors of Nursing who were in the units saying that you need to arrive at 7 a.m. on a daily basis so that you can see the shifts, people coming in on and off of the shifts. The reason, my opponent has pointed out the fact that Evita Thompson, who's a black American, was not required to do that. The reason is she is the House Director of Nursing. Two of them clearly puts in their national origin and you can maybe nuance that in terms of the basis of race, but insofar as in the hostile work environment. I don't know if she was ever terminated or not, but in any way, with regard to the hostile work environment, she made an allegation that this supervisor, whomever referred to her as African and said that she had to I guess protect herself because these people were putting voodoo on them. When you look at St. Francis in terms of the broadness of the definition of race you've had it, Mrs. Brennan and others brought it out that when you talk of national origin and race, sometimes those get really, really close. Why is it not that in a case of ESA, this is one of those really, really close cases in which she's made enough allegations here that this goes beyond just national origin, but really more into ethnicity and into race which would be sufficient for 1981? I believe, Your Honor, that the distinction here is that the voodoo allegation is based on voodoo being a religion, a religious practice and that there's case law that we've cited, the Abdallah case from the Eastern District of Pennsylvania which holds that even a religion, even if closely allied with a certain ethnic background is not sufficient to state a 1981 claim. Well, it's also used in a stereotypical sense here. Don't you agree? I mean, it's more than just religion, not like you said they're Christian or Muslim. It's being used in a manner so as to group a people. I don't agree, Your Honor. I think it's more of a practice with showing the voodoo net or whatever it may be that sort of corresponds with that religious belief if you hold on to it. But if you don't. Mr. McCollum, isn't the whole point of the case law particularly St. Francis that we look at these expansively. I mean, the court said, you know, Arabs can be a race. Greeks can be a race. Germans can be a race. So, I mean, the court doesn't want, it seems to me does not want to close the door on cases under 1981 by drawing a very fine line which it seems to me are threading the needle like you're trying to do here. Why would given the case law, why would these not qualify? I mean, if Greeks can be a race and Arabs can be a race and Germans can be a race, why can't black Africans be a race? Well, I think based on what is plot in the complaint I don't think there's enough to show the racial nature of what's being alleged here. I mean, I look at the Akinjidi case where a plaintiff mentions he's from Nigeria and makes reference to ethnic characteristics and that wasn't enough to establish a claim under 1981. So, I understand what you're saying, Your Honor. I think that  to Voodoo, that's not new to Maryland. Maryland has a case on point that deals with a situation where Cameroonian, they said she was getting her sales based on Voodoo. The court says that's sufficient to allege a race type claim under 1981. I mean, we don't, I grant you that maybe it's closer in the instance where the other two where they specifically say we are seeking relief as a national origin because we're in Africa, Africans and that sort of thing. I got that. Maybe that doesn't give you that plus factor but here you do have a plus factor and that is she makes this additional statement regarding the Voodoo. I'm having it, you people are putting Voodoo on me and I'm having to protect myself. Similar to the Maryland case, don't you think? I mean, I think that her first of all, with respect to Ms. Ezer, she only alleges that one comment that was made. That she only heard that one time. I think it's more of the type of thing that sort of reflects maybe it was said in a way that may implicate a belief but I'm not sure that it necessarily goes to animus against Africans in general since Voodoo is something that can be practiced by many people in many different nations. You may be correct but this is summary judgment. Yes. Which sounds like to me, you're telling me you can win this case pretty easily when it goes back on that but as a matter of law we're looking at it as a basis to make the allegation we look at it like most favorable and under these circumstances, granted it's closed the Supreme Court has recognized that in St. Francis what's national origin, what's an allegation sufficient to allege race but in this particular instance with Ezer, she does make those additional allegations. The other two don't. Also, Your Honor, when asked specifically in her deposition, when I asked her whether she was making a claim of race discrimination or national origin discrimination, she specifically said in her testimony that it was based on her national origin, the fact that she's from Africa. You were asking her a question of law, weren't you? Well, I was asking her a question that whatever question it is the way I was directing it was to make sure that I understood what the basis of her claim is. She's bound by what she says in her deposition. If she says she's proceeding based on the fact that it's her national origin, the fact that she's from Africa from a certain nation and not on the basis of race then she can't go back on that. That's what the testimony is. Regardless, I mean for Ezer's claims the analysis ultimately for the hostile work environment and, I'm sorry, for the retaliation and other claims is the same. In the sense that you still have to prove that either the race or the national origin was the basis for what ultimately happened. With respect to all three with Ndozi there was an extensive there was disciplinary actions in her file before Ms. Zimmerman and Ms. Hacredo got there. In her previous role she had gotten a very negative performance review in the place that she was before she came over to Randallstown. Those are reasons that might go to the retaliation claim but she was told to terminate African Americans according to the complaint and she alleged that she was a black African I'm sorry, she was told to terminate Africans and she alleged that she was a black African so why isn't that enough in the hostile work environment? I think in Ndozi's case what she specifically talked about was the fact that there were people who Ms. Zimmerman discussed with her that she felt needed discipline and Ms. Ndozi herself never said that the people that Ms. Zimmerman read off did not in fact deserve discipline and in fact Ndozi herself has in her testimony talked about the fact that she herself had identified certain people several of whom had African names for discipline herself. That's in the record before Ms. Zimmerman and Ms. Hockradle ever came there. That was something that she would ask Lisa Desern who was the payroll person there what level of discipline is a certain person on? First of all in terms of the list of Africans I think as the district court correctly concluded there's no basis to say that there was this list of African employees Ms. Ndozi never saw the list Ms. Zimmerman was just stating names and it just happened to be that many of the people who were working there were African and as far as the fact that there were different problems and different things that needed to be done in terms of discipline Ms. Ndozi's contention really is that she did not agree with Ms. Zimmerman's basically philosophy which is in accordance with what the company says is that we use disciplinary actions rather than education. When I asked her in her deposition that's basically what she testified to is that she wanted to give education where Ms. Zimmerman wanted to give discipline and it's part of what had happened. What about Ross's testimony? Ross's testimony The judge just ignored it I scoured that opinion for some reference to Ross and he just blipped it Why is that significant? He did not go into Ms. Ross's testimony and I think for good reason First of all, Ms. Ross was hired in April of 2011 so anything that happened with her had nothing to do with Ndozi because Ndozi wasn't even employed at that time Secondly, with respect to the other two Ms. Eza was an evening supervisor she did not directly supervise Ms. Eza she was not involved in any of the decisions that are complained about in this case ultimately She was not involved in issuing the performance improvement plan to Ms. Eza Wasn't Ross talking about the working environment for these black applicants and how management had it in for them? She did talk about that but I think that with respect to the environment with each person having to allege what actually happened with them in terms of what events and what happened that they think constituted a hostile work environment Ms. Eza none of them specifically referred to Ms. Ross's testimony or the things that happened with Ms. Ross as being something they knew about while they were there Ms. Ross being the evening supervisor she might have some knowledge as to others but as to the specific claims of the plaintiffs here she was not involved I would just like to say with respect to Iena because I haven't touched on him yet the plaintiff only devotes about a paragraph in his brief to dealing with Iena It's the one with the wet gowns, right? Yeah, the wet gown and he had several disciplinary actions before he came to the center before Ms. Zimmerman and Ms. Hockradle came to the center and at the time when they came he had already been written up by two African nurses well, three by Ms. Enigbu, who had been the director of nursing by Mohamed Forna, who was also African and Ms. Eza so he had received several disciplinary actions from African supervisors and again, in his complaint he makes no allegations that would implicate Section 1981 and he failed to exhaust his Title VII claim with respect to his termination so the termination is the only thing that Mr. Iena is complaining about in this case based on 1981 and based on the allegations that he has Mr. Iena cannot make out a claim under Section 1981 because, again, his allegations were based on his country of origin he said that in his questionnaire to the EEOC, when asked the reason, the basis for his claim of employment discrimination he says, because I am from Africa I just want to make sure I ask you the same question I asked your colleague, because I'm trying to figure out how much of the 1981 issue we have to decide so if we agree with you that Mr. Iena just on its face doesn't have a termination claim because of his very long disciplinary record we wouldn't have to reach the 1981 question as to whether or not he adequately alleged a 1981 claim, right? Do you know what I'm saying? What I'm trying to figure out is does this question of whether race and ethnicity was adequately alleged by any of these plaintiffs on your theory of the case, does it make any difference if we agree with you on sort of the merits of their claims under Title VII, does it matter whether they also had a 1981 claim? It doesn't matter, Your Honor except, of course, with Iena's, that is his only hope is if he has a 1981 claim. I assume you think that even if he has adequately pled 1981 it doesn't matter because the defendant should get summary judgment on the merits given his long disciplinary record. That is correct, Your Honor. And it seems like it might have made a difference if there had been an appeal on the exhaustion determinations because 1981 doesn't have an exhaustion requirement but your colleague clarified what I think was already pretty clear from the brief that he's not appealing any of the exhaustion determinations. Yes. That is correct, Your Honor. So in summary, with respect to all three there were again, significant disciplinary history that had been identified before Ms. Zimmerman and Ms. Hockradle came to the center which ultimately resulted in the disciplinary actions they received. Now with respect to her resignation that happened at the end for her, I just wanted to make clear. Ms. Eza first of all, went out on FMLA leave for reasons having nothing to do with the environment. She went out because of a hepatitis C patient that she had come into contact with. She ultimately stayed out more than the 12 weeks so she didn't have job protection anyway. So they didn't have to take her back. They simply told her what the expectation was, which is that she would have to come in at 7 o'clock in the morning and she refused to do that. Ms. Eza wanted to set her own hours and the company simply did not want to allow that. They weren't obligated to call her. They could have called her, again, and what she would have done had she been called really is of no moment. The documentary evidence is clear that she said it will be 8 o'clock a.m. or later. She started to try to set her own hours and the person, Kim Jordan who filled her position, came in at 7 a.m. That's clear in the record. Your Honors, it appears I'm out of time so unless you have any other questions. Thank you, Your Honors. Mr. Goldsmith, your rebuttal. If I might begin with Judge Wynn's question having taken a look at the complaint while Mr. McCallum was arguing. The complaint the term that's used within the Statement of Claims is national origin. Also used within the Statement of Claims is African it says black African national origin I believe is the phrase that was used. I forgot the two of them. Within the caption though and at the conclusion of each Statement of Claim it says that the claim sounds under 1981. 1981 does not cover national origin per se but it covers something that's very close to national origin. For instance, it covers ancestry but not the actual place of birth. It didn't have a concept of understanding national origin it wasn't covered by 1981. There was an error made there. However, no 12B6 was filed on that. Discovery proceeded on that. There were interrogatory answers, deposition testimony, etc. explaining that this was a 1981 claim. Again, the whole source of the identity figuring out what the identity is that is being mistreated and is disliked by the employer comes from what the employer says. The employer says the Africans we believe that things were sufficiently pled and then notice pleading, etc. that they were on notice that this 1981 claim was there based on what the complaint also said which was black Africans. I think that's in essence the best answer to the question. I think one thing that I don't want to see us get lost in the weeds about here is that this is a summary judgment appeal. There are ample disputes of fact about virtually everything that Mr. McCallum said but the framework that I would hope the court would use to look at this is that where we have all these statements which is Judge Keenan's earlier question could possibly be burden shifting statements in terms of the animus of the employer and then we have specific situations where that animus is implemented that's a case for the jury. With Mr. Aina in particular let's just remember that in June of 2011 he was told by one of the managers by Ms. Hockradle that they wanted to get rid of him and they said we want to get rid of you you're one of the Africans. They said that to him. That can't be a summary judgment case. That is for the jury because again Mr. Aina then alleges the scenario of what they say they fired him for the event on the day when the state regulator was in the facility. Considering the other evidence here number one he may have just been discriminated against in terms of the decision to fire him under the circumstances but there's also a real possibility that the jury could see the action that was taken against him to mislead him into committing the act that they later fired him for as some kind of set up against him because he was one of the Africans. We can't escape and along the same lines there's been discussion about the Ross comments discussion about which comments were made what was said to Ndozi what was said to Aina all of these bear on the animus just because the person hears only some of it there's authority from this court that the victim in the hospital environment situation need not personally be aware of everything that's considered they need to be aware of enough so that it affects them in terms of having a reasonable claim that they have been harassed but we've got way more than that when we can understand where the harassment is coming from so the repeated statements against Africans are highly relevant in all three of these situations now going back earlier there was a question about whether whether Ms. Eze was terminated and I think if the court reviews the briefs it will see and also clearly the correspondence and the emails from that time Ms. Eze was terminated again the issue about the 7am that's an issue but there's no discipline against her they don't tell her at the time we're giving you a direct order to come to work at 7am or else you can't have a job anymore they tell her yes you can have a job and then they don't give her one why would they do that? well it comes back to her protected activity and it comes back to her being African and the statements that have been made that is the intent I believe the hostile work environments here are sufficient to meet the court's standard under Bristow and Witten the employer's desire and the same is true of the constructive discharge from Ms. Ndozi clearly the desire to have them leave was expressed directly, repeatedly I'll take your resignation if you'll give it to me but that's not the point of constructive discharge the point of constructive discharge is that conditions became so intolerable that the employee had no other alternative yes I believe Judge Keenan hinting you want the employee to go elsewhere does not build a case for constructive discharge there's no hinting here there's no authority from this court that that would be sufficient I'm not sure that it shouldn't be but here we need not reach that question because the employer's deliberateness of action is matched with the intolerability of working conditions telling people basically I hate your kind telling people I want them gone you're going to be the one in Ndozi's case you're going to be the one who carries it out telling that to another supervisor to do the same thing as Ross all of that permeates everything that happens here it's for the jury to sort out so you were not raising a constructive discharge claim that's based on this writing on the wall theory that even if the general conditions are not sufficiently intolerable it's enough if the employer effectively says you can resign or I'll fire you I believe there's an open question about whether that could be enough are you using it? our primary argument is that there clearly is enough because these working conditions are intolerable so that's what you want us to focus on don't worry about the writing on the wall I believe that the facts here are perfect for the writing on the wall but I'm not sure the court will go in that direction so I want to make sure that I highlight the fact that the working conditions are highly intolerable what are your best facts for the writing on the wall theory where can you point me to where someone says not just I'll take your resignation because that's not what these cases are talking about but if you don't resign I'm going to fire you there is a statement to and I know my time has expired there is a statement to Ms. Ezeth that goes beyond that that I know is in the briefs the statements I don't believe any of the statements are 100% unequivocal on their face directly I believe that the statements are particularly considering that there are multiple statements made to the people there is other evidence in the record about this laughing, taunting crumpling up documents etc all of this goes to the idea and in Ms. Mendoza's case there was real concern about her license to continue practicing as a nurse in wake of the pick line incident which no doctor said she did anything wrong with the pick line she explained exactly what happened in her principal brief here and there was no response from the appellees to the effect that she was wrong about that it sounds like you are launching into argument rather than answering the question let me ask the chair I'm sorry if that was the case it was not my intent
judges: Barbara Milano Keenan, James A. Wynn Jr., Pamela A. Harris